IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION


STEVEN K. DAVIDSON                                                                                    PLAINTIFF

v.                                      Civil No. 04-3028

JO ANNE B. BARNHART, Commissioner,
Social Security Administration                                                                     DEFENDANT


**MEMORANDUM OPINION**

  Plaintiff Steven K. Davidson brings this action for review of a decision of the Commissioner of Social Security finding him not disabled.

DISCUSSION

  Plaintiff filed for disability insurance benefits on July 29, 2002, alleging disability due to seizures, depression/anxiety, sleep apnea/ insomnia, low back pain, and numbness in the right hand. The application was denied initially and on reconsideration. On August 21, 2003, a hearing was held before an Administrative Law Judge (ALJ). On December 9, 2003, the ALJ issued a decision finding plaintiff not disabled.

  Plaintiff was born on May 9, 1956, and was 47 years old at the time of the ALJ's decision. He has a high school education and past work experience as a body shop estimator, truck driver/heavy equipment operator/crew worker, and automobile salesman.

  At the hearing before the ALJ, plaintiff testified that as a body shop estimator, he dealt with customers, estimated body damages for insurance companies using a computer program, scheduled the work, ordered parts, did payroll, delivered the cars to the customers, and collected the money. He lifted car parts weighing 40 to 50 pounds. He stood half the time and sat half the time. His last

work was as an estimator at his parent's body shop and he worked there until the business closed at the end of 2002. As a car salesman, he did no significant lifting. He figured loans and arranged loans and spent 75 percent of his time walking and standing.

Plaintiff testified his back has bothered him since 1979 after an accident and has become worse over the years but he muddled through until he started having the seizures. He did not remember the date of his first seizure but he stopped working on April 30, 2002. When asked what his problem was that keeps him from working, plaintiff responded one problem is that since he had a seizure he is not suppose to drive. Plaintiff stated he has not had a seizure in a while and that with the last three he did not go to a doctor. However, he has not had a seizure since he started taking medication.

Plaintiff further testified that his lower back pain is pretty bad if he sits too long. Also, he is depressed all the time because of his "situation" – he bought a nice house on the river three years ago and is afraid he is going to lose it. Dr. Snow prescribed amitriptyline and Librium for anxiety but the drugs knocked him out and made him feel "weird" and he stopped taking them. Plaintiff offered that he now only takes Keppra for seizures. He said he does not drink hard liquor anymore but drinks a couple of beers a day.

Plaintiff explained he has had several blows to the head area. One was in 1976 when he fell from a ladder; he lost consciousness and sprained his ankles. Then in 1979 he had a vehicle accident and broke his leg and had a concussion and was out for over 10 hours. Then in 2002 he had a table leg broken over his head. The blow dazed him but he did not lose consciousness. His head was split "from one end to the other." He went to the hospital on this occasion and still suffers daily dizziness that lasts 30 seconds and he has to sit down.

Plaintiff added that in the winter, two fingers on his right hand turn white and he has no feeling in them. He saw a doctor once who told him he had inadequate blood flow and since that time he has dealt with it.

Plaintiff continued that he has problems sleeping and gets only two to three hours of restful sleep. He says he was diagnosed with sleep apnea by Dr. Snow. Dr. Snow has not prescribed anything for it because he knows he cannot afford medicine since he has no medical insurance. He last had medical insurance in 1991 when he stopped selling cars. Since 1991, he has paid cash. When asked about his income, he stated he just received an inheritance from his grandfather but added he used almost all of it to pay off credit card debt and is paying on a computer that he bought. Plaintiff said he was 5 foot nine inches and weighed approximately 300 pounds. He also said he has a bad knee.

David Haynes, who knew plaintiff five years prior to the hearing, testified he saw plaintiff have a seizure at work in 2000 and another episode on July 14, 2003. The two had come home from plaintiff's mother's house and plaintiff went to take a shower. Plaintiff hollered and said he didn't know how to turn the shower off. Hayes thought he was kidding and turned him off and made a joke that he didn't know anything about plumbing and starting cooking. Plaintiff walked out of the bedroom with a gun, completely dazed and "out of his mind" (T. 56) and shot Haynes. Haynes had to scream at him and "like wake him up out of a dream." (T. 56). There was no drinking involved. Plaintiff woke up and was upset. Scott Smith, a friend of plaintiff's, testified that he worked at the body shop with plaintiff and saw the first seizure. Plaintiff was dazed and did not know what was going on. Also, while at work and prior to the seizures, plaintiff fell asleep daily four to five times and had to be awakened.

At the hearing, plaintiff was asked about a questionnaire he completed for his attorney on July 26, 2003. (Questionnaire, T. 148-165). In the questionnaire, plaintiff stated that during the fall semester of 2002 he attended courses in blueprint reading and introduction to computers. He further stated in the form that he cannot lift over 20 pounds and can walk 30 minutes at most. He explained at the hearing that after that time his legs give out, he is out of breath, and his back and knee hurt. Also, because of no sleep, he is always tired and when he went to a recent computer class, he had problems in the class falling asleep. He cannot sit or stand for prolonged periods and spends six hours a day lying down. He is only up for one hour in a 24-hour period doing something productive like dishes or cleaning the house. Also, he can hardly do the lawn work anymore because of the weed eater. He cannot bend, twist, squat, crawl, climb. He is afraid of heights and has allergies. Loud noises scare him and he suffers from claustrophobia and anxiety. He leaves the house every other day to check his mail. His mom does most of his grocery shopping. He is not a member of any organization and just stays home.

In the questionnaire, plaintiff stated he daily cooks and washes dishes, makes his bed, grooms himself, and talks to neighbors. He weekly cleans house, dusts, vacuums, mops floors, does laundry, makes the bed, does yard work, grocery shops, pays bills and handles finances, goes fishing, visits relatives, and visits friends. He monthly fixes things. He watches television or listens to radio 10 hours a day and sleeps or stays in bed 8 hours a day. (T. 161).

In an earlier form completed on August 25, 2002, (T. 123-24) plaintiff stated he does the laundry, dishes, changes the sheets, vacuums/sweeps, takes out the trash, washes the car, and mows the lawn. He does errands including buying groceries, clothes, banking, and going to the post office. He cooks seven days a week, including dishes that require a recipe, and it usually takes him 30

minutes to prepare a meal.  He walks for errands or exercise, noting that his back hurts when he walks any length of time.  He watches television, listens to the radio, and visits with friends.  He listed his weight at 175 pounds.

A vocational expert (VE) testified at the hearing that plaintiff's past work as a body shop estimator is generally considered skilled light work but because plaintiff indicated he occasionally lifted 40 to 50 pounds, the exertion level would be medium.  Automobile sales is classified as a skilled light exertion level job.  Transferrable skills include communications and computer skills.

The ALJ provided a hypothetical to the VE of a person of plaintiff's age, education, and background who has the residual functional capacity (RFC) to lift and/or carry 50 pounds occasionally and 25 pounds frequently, push and pull within those limitations, stand and/or walk up to six hours out of an eight-hour work day and sit six hours of an eight-hour day.  He can frequently squat, crouch, crawl, and climb but is unable to climb ladders or scaffolds.  Further, due to seizure restrictions, plaintiff is unable to work at unprotected heights and around unprotected moving machinery.  Also, plaintiff is unable to drive due to the legal requirements concerning seizures.  The ALJ opined that such a person could perform plaintiff's past work as a body shop estimator and car salesman.

The medical records of Dr. William R. Snow dating from late 1995 to November 2001 show that the doctor saw plaintiff once in 1995, twice in 1997, twice in 1999, and once in 2000.  In 1997, plaintiff had a bout of dizziness at work.  In 1999, plaintiff complained that he sleeps during the day.  The doctor advised him to give up smoking and alcohol and lose weight and mentioned a sleep study program.  There is no follow-up to this.

On November 7, 2001, plaintiff was admitted to the hospital and discharged the next morning. Plaintiff complained of being lightheaded and semi-conscious for approximately 15 minutes. He said he had an episode of confusion and disorientation while driving his truck in the parking lot. His co-workers brought him to the hospital. The doctor stated that by the time plaintiff reached the emergency room he had regained consciousness and felt relatively well. The doctor reported a long history of heavy alcohol and heavy tobacco use and of having some contact with illegal drugs in the past with a seizure related apparently to cocaine several years ago. Plaintiff reported he had over the past several months significantly reduced his alcohol intake and lowered his weight by 50 pounds. He continued to smoke two packs a day. He recovered and had no further difficulties. He was admitted to the hospital for observation. The admitting diagnosis was possible seizure disorder, large hematoma of the tongue, and chronic alcohol and tobacco abuse. In the hospital, plaintiff had no further difficulties. An EEG was ordered to rule out the possibility of a seizure disorder.

On November 18, 2001, an EEG was conducted by neurologist Dr. Bruce Robbins. No abnormalities were detected. The impression was normal "awake and asleep." (Ex. 7E).

On December 16, 2001, plaintiff was seen at a hospital emergency room complaining he that he had been hit in the head with a board or stick at 3 or 4 a.m. The doctor noted that plaintiff smelled strongly of "ETOH" (ethyl alcohol). Plaintiff admitted to significant use of alcohol which had clouded his memory. The exam showed a 6 centimeter laceration in the panetal scalp area. The lesions were cleaned and no sutures were requires. A pressure dressing was applied. An x-ray showed no skull fracture but the radiologist stated he might recommend a CT scan of the brain to exclude intracranial injury.

On June 3, 2002, plaintiff reported to his physician Dr. William R. Snow that he had two recent seizures after suddenly stopping drinking. Dr. Snow referred him to neurologist Dr. Robbins.

Plaintiff saw Dr. Robbins on June 19, 2002, who reported that plaintiff had three apparent seizures in the last months; the last two spells were associated with fairly heaving drinking and then going without alcohol for a day or so; plaintiff apparently had seizures when he was younger and this may have been associated with drug use; plaintiff smokes two packs a day and drinks about a six pack a day. The doctor continued that plaintiff had numerous imaging studies done, all of which were negative. Plaintiff had a closed head injury the month before when someone hit him on the head with a table leg. During physical examination, the doctor found plaintiff oriented, attentive, with normal speech, knowledge, and recent and remote memory. The musculoskeletal exam findings were that gait and station was normal, including tandem and Romberg; muscle strength in the upper and lower extremities was within normal limits for the patient's age; normal muscle tone in all extremities, no evidence of atrophy or abnormal movements. The diagnosis was seizures, probably related to alcohol withdrawal, headaches, and back pain. The recommendations were no more alcohol and no driving for one year. The doctor opined that if plaintiff continues to have seizures, with cessation of alcohol, then a prescription of Keppra 500 would probably be helpful, as well as an MRI scan of the head.

On August 2, 2002, plaintiff saw Dr. Snow for anxiety and insomnia. The doctor advised plaintiff to cease use of alcohol and prescribed what appears to be Amitriptyline and Serax.

On October 8, 2002, plaintiff saw Dr. Robbins stating he had a seizure while guiding a boat on a river. Plaintiff denied using alcohol within a couple of weeks prior to the incident. The doctor noted that an EEG and CAT scan were negative. Plaintiff was started on Keppra 500 mg twice a day

and advised not to try driving for one year. An MRI scan was offered but plaintiff was not enthusiastic due to his large body mass and claustrophobia. There is no follow-up to this report.

On September 9, 2003, a few weeks after the hearing before the ALJ, plaintiff saw neurologist Dr. Vann. A. Smith from Mountain Home, Arkansas. Plaintiff presented himself with impaired recall memory, impaired attention to sequential detail, impaired concentration, sleep pattern disturbance, bradyphrenia, and dysexecutivism.

Dr. Smith found that plaintiff's medical history was significant for the complained-of neurocognitive symptoms. Plaintiff reported a positive history of seizure disorder, sleep apnea, and narcolepsy. The doctor stated that plaintiff's history is positive for "several" significant closed heat injuries with resultant Grade III concussion and secondary to falls, MVAs and an assault. The doctor stated that plaintiff's history is positive for psychiatric attention in that plaintiff has seen a school counselor for family problems. Plaintiff reported drinking two to three alcoholic beverages per day and smoking one and one-half packages of cigarettes per day. Regarding mental status, Dr. Smith reported that plaintiff was oriented but his memory was mildly impaired and his affect somewhat muted but flexible. He was mildly anxious. His judgment and insight were intact and his abstract thought processes were functional. His native intelligence was estimated to be within the normal range.

Dr. Smith administered a number of neurophycodiagnostic screening tests, including aphasia screening, trail making, and clock drawing. On the "Reitan Indiana" aphasia testing, the doctor stated that plaintiff's results shows constructional dyspraxia and ideokinetic dyspraxia. On the clock drawing test, plaintiff had contour distortion, midpoint displacement, and equivocal hand length.

Dr. Smith concluded, based on the clinical history provided, the mental status examination, and the screening test data, that there was a pattern of abnormal findings consistent with the presence of impaired brain function similar to that associated with the sequel of traumatic brain insult as well as chronic metabolic, toxic, or hypoxic encephalopathies. In the doctor's view, the data are consistent with the patient's history of multiple, significant traumatic brain injuries and the residua thereof, seizure disorder and narcolepsy. The symptoms markedly interfere with his capacity to carry out routine activities of daily living, rendering him disabled at this time. The doctor's official diagnoses were: organic brain syndrome, secondary to TBI and cognitive dysfunction, non-psychotic, secondary to OBS, and multiple TBI's resulting in seizure disorder and narcolepsy.

In his opinion, the ALJ found that plaintiff has a severe impairment – "an apparent seizure disorder and/or organic brain syndrome/cognitive dysfunction, non-psychotic" but that the impairment did not meet or equal an impairment in the Listing of Impairments. (T. 12) The ALJ found that plaintiff does not suffer from severe impairments with regard to his allegations of disability due to anxiety/depression, sleep apnea/ insomnia, low back pain, and numbness in his right hand. The ALJ relied on the RFC assessment given in the hypothetical to the VE at the hearing and concluded that plaintiff's RFC does not prevent him from performing his past work as a body shop estimator and automobile salesman and, thus, plaintiff is not disabled.

The issue before this court is whether the Commissioner's decision is supported by substantial record evidence. "We will affirm the ALJ's findings if supported by substantial evidence on the record as a whole." *Beckley v.* Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). "Substantial evidence is less than a preponderance, but it is enough that a reasonable mind might accept it as adequate to support a decision." *Id. See also Cunningham v. Apfel*, 222 F.3d 496, 500 (8th Cir. 2000). "However,

our review 'is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision, we also take into account whatever in the record fairly detracts from that decision.' Nevertheless, as long as there is substantial evidence in the record to support the Commissioner's decision, we will not reverse it simply because substantial evidence exists in the record that would have supported a different outcome, *Shannon v. Chater*, 54 F.3d 484, 486 (8th Cir. 1995), or 'because we would have decided the case differently.'" *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001)(citations omitted).

A five-part analysis is utilized in social security disability cases. *See e.g., Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000). Applying this analysis, the ALJ must determine, sequentially, the following: (1) whether the claimant is employed; (2) whether the claimant has a severe impairment; (3) whether the impairment meets a listed impairment; (4) whether the impairment prevents the claimant from doing past work; and, (5) whether the impairment prevents the claimant from doing any other work. *Id. See also* 20 C.F.R. §§ 404.1520, 416.920.

"If the claimant fails at any step, the ALJ need not continue. The claimant carries the burden of establishing that [he] is unable to perform ]his] past relevant work, *i.e.*, through step four, at which time the burden shifts to the Commissioner to establish that [he] maintains the residual functional capacity to perform a significant number of jobs within the national economy." *Banks v. Massanari*, 258 F.3d 820, 824 (8th Cir. 20010) (*citing Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000)).

In determining plaintiff's impairments and assessing his RFC, the ALJ discredited plaintiff's subjective complaints, citing *Polaski v. Heckler*. The ALJ also rejected the report of Dr. Smith based on a post-hearing examination.

> The ALJ's decision to discredit Dixon's subjective complaints of
> PTSD must be supported by substantial evidence. *Rautio v. Bowen*,

> 862 F.2d 176, 179 (8th Cir. 1988). In discrediting a claimant's subjective complaints, an ALJ is required to consider all available evidence on the record as a whole and is required to make an express credibility determination. *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000). Because of the difficulty evaluating medical symptoms such as pain and suffering, the Social Security Administration and this court have established guidelines for evaluating a claimant's subjective complaints. Factors to be considered include the claimant's daily activities; the duration, frequency, and intensity of the pain; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984); 20 C.F.R. § 404.1529(c)(3) (2003). Additional factors include treatments, other than medication, that the claimant has used to relieve pain or other symptoms, and any other measures that the claimant has used to relieve pain and other symptoms. 20 C.F.R. § 404.1529(c)(3)(v-vi) (2003). Furthermore, "[t]he ALJ may discount subjective complaints of physical and mental health problems that are inconsistent with medical reports, daily activities, and other such evidence." *Gwathney v. Chater*, 104 F.3d 1043, 1045 (8th Cir. 1997).

*Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003).

Substantial evidence on the record as a whole supports the ALJ's conclusion that plaintiff does not suffer from a severe impairment with regard to his allegations of disability due to sleep apnea/insomnia, anxiety/depression, low back pain/ numbness in right hand. Allegations of a severe impairment may be discounted "when an impairment or combination of impairments would have no more than a minimal effect on the claimant's ability to work." *Simmons v. Massanari*, 264 F.3d 751, 755 (8th Cir. 2001).

As pointed out by the ALJ, there is substantial evidence inconsistent with plaintiff's complaints of disability from these causes. Plaintiff has never been diagnosed with a sleep disorder and in November 2001 had a normal EEG awake and asleep. As early as 1999, Dr. Snow recommended that plaintiff quit smoking two packs of cigarettes per day, discontinue alcohol use,

lose weight, and undergo a sleep study program. There is no evidence of compliance with doctor's orders. In 2002, plaintiff complained to Dr. Snow about anxiety and insomnia but continued to use alcohol. Nevertheless, plaintiff was prescribed Amitriptyline and Serax but discontinued use of the medicine because it made him feel weird. Plaintiff has not specifically mentioned depression to his doctors, aside from anxiety, and even when plaintiff saw Dr. Smith in September 2003 the doctor noted only mild anxiety and a somewhat muted but flexible affect. The ALJ also relied on plaintiff's reported numerous daily activities, including visiting with friends and going back to school in 2002, that were inconsistent with complaints of disabling complaints

Regarding low back pain and numbness in the right hand, the ALJ pointed out that in 2002 when plaintiff was seen by Dr. Robbins with low back pain, musculoskeletal examination showed normal gait and station and normal muscle tone and strength without evidence of atrophy or abnormal limits. There are not additional medical records in which back pain is mentioned nor any mention at all of right hand complaints. *See Comstrock v. Chater*, 91 F.3d 1143, 1147 (8th Cir. 1996) (failure to seek regular treatment inconsistent with claims of disabling condition). At the hearing plaintiff claimed he has no insurance since he worked in car sales and therefore could not afford medication and medical care. However, the plaintiff continues to spend monies to smoke and drink and there is no proof he has asked for free medication/medical services.

There is substantial evidence on the record as a whole supporting the ALJ's decision that despite plaintiff's severe impairments – an apparent seizure disorder and/or organic brain syndrome/cognitive dysfunction, non-psychotic – plaintiff has the RFC to return to his work as a body shop estimator. The ALJ found that it appears the seizures are being fairly well controlled with Keppra which Dr. Robbins prescribed in October 2002. Plaintiff was suppose to follow-up with Dr.

Robbins but there are no further records, indicating the symptoms were not serious enough for additional treatment by Dr. Robbins or an MRI as discussed by Dr. Robbins. The ALJ stated there is some question whether the claimant is actually experiencing seizures as the result of impaired brain functioning or if he is simply experiencing seizures related to alcohol withdrawal. In June 2001, plaintiff told Dr. Robbins that two of his three seizures came after heaving drinking and then abstention. An EEG in November 2001 showed no abnormalities. The ALJ also noted that plaintiff quit his last job not from allegedly disability impairment but because the shop closed. *See Depover v. Barnhart*, 349 F.3d 563, 566 (8th Cir. 2003). Also, the report of plaintiff's daily activities reflect that plaintiff's symptoms are not as serious as he portrays.

The ALJ rejected Dr. Smith's report, stating the examination that formed the basis of the opinion was not performed in an attempt to obtain treatment but was an attorney referral in an effort to generate evidence for the current appeal. The ALJ stated that the doctor relied on plaintiff's head injuries for neurocognitive problems that but the record showed plaintiff worked and functioned in society after those injuries, noting that plaintiff worked after his last reported injury in November 2001. In addition, it appears that Dr. Smith was provided selective information concerning plaintiff in that plaintiff's excessive use of alcohol, triggering past problems, was not addressed.

CONCLUSION

Because substantial evidence on the record as a whole supports the ALJ's determinations, this court finds that the Commissioner's decision should be affirmed. A separate judgment will enter.

DATED this 23rd day of August 2005.

                                      /s/Beverly Stites Jones
                                      HON. BEVERLY STITES JONES
                                      UNITED STATES MAGISTRATE JUDGE